Brown, J.
¶1 — T.T. appeals a superior court judge’s denial of her request to revise a commissioner’s ruling granting the Department of Social and Health Services’ (Department) dependency petition for her daughters, Ca.R., Cl.R., and G.R. T.T. contends the court erred in finding she was not capable of adequately caring for the girls, ordering out-of-home placement, and ordering an “Interstate Compact on the Placement of Children” investigation (ICPC), ch. 26.34 RCW, with Nevada before the children’s placement with her. We find no abuse of trial court discretion in the trial court’s dependency and placement decisions. We lack a record of Nevada’s ICPC involvement. Thus, T.T.’s ICPC concerns are both premature and ungrounded. Accordingly, we affirm.
FACTS
¶2 In 2011, the State of Nevada removed Ca.R. (born January 19, 2002), Cl.R. (born January 17, 2005), and G.R. (born October 7, 2006) from T.T.’s care along with a younger *605 stepbrother, A.G., who is not a subject of this appeal. Nevada then petitioned for dependency based on Ca.R.’s allegations of sexual abuse by her mother’s boyfriend, A.G.’s father; domestic violence; and T.T.’s drug use. Later, the three girls were placed with their father in Oregon after an ICPC approval. The Nevada dependency was then dismissed as to the girls. The girls moved to Spokane with their father in the summer of 2013.
¶3 In January 2014, Ca.R. alleged her father sexually abused her and the Department petitioned for dependency. T.T. appeared through counsel. The girls had not seen T.T. since leaving Nevada but had frequent telephone conversations with her. On March 26, 2014, the girls’ father agreed to dependency. T.T. participated telephonically in a family team decision meeting, unsuccessfully requesting placement of the girls with her in Nevada as soon as possible, without having to wait for the results of an ICPC request.
¶4 A fact-finding hearing was held in May. Ca.R. was then in her second placement, while Cl.R. and G.R. were still together in their first placement. The Department moved Ca.R. to a receiving home from her first placement because she had displayed disruptive behavior, including head banging, excessive attention-seeking behavior, and overattachment to people. Ca.R. reports she is very angry and has nightmares. Evidence showed T.T. suffers from posttraumatic stress disorder and panic disorder with agoraphobia. G.R. and Cl.R. struggle with being overly afraid of bugs, the outdoors, and trees. T.T. related she lives with her significant other, A.O., and her two sons, A.G. and Z.O.
¶5 After fact-finding, the commissioner entered findings of fact noting the amount of work T.T. had done to have her younger boys returned to her care, but found, “The court is concerned that the services provided during mother’s dependency in Nevada were not directed at reunifying her with [Ca.R., Cl.R., and G.R.].” Clerk’s Papers (CP) at 85. Specifically, the commissioner found, “The trauma that the children experienced in the mother’s home (mother’s sub *606 stance abuse and domestic violence as well as [Ca.R.’s] disclosure of sexual abuse by mother’s former partner) has not been addressed.” CP at 85. Further, “[Ca.R.] has significant behavioral and emotional issues. She is just now beginning to deal with these issues in counseling. Her behavior appears to be parentified. If she were to be placed with her mother today she would suddenly have new siblings and a new father figure as well as re-adjusting to living with her mother. This could set the family up for failure.” CP at 86. The commissioner found, “An ICPC approval is needed so that the State of Nevada will provide oversight of the family if [Ca.R.] is placed in the home.” CP at 86 (Finding of Fact i).
¶6 The commissioner granted the dependency petition, ruling, “[T.T.] is currently not capable of parenting [Ca.R., Cl.R., or G.R.] due to the unresolved issues that led to the dependency in Nevada. Specifically, T.T. needs to repair her relationship with the girls, and to demonstrate that she can attend to their emotional needs including participating in any family counseling or other therapy needed. Mother also needs to continue her commitment to sobriety.” CP at 86.
¶7 The commissioner then found, “[A]n ICPC approval is needed so that the State of Nevada will provide oversight of the family if [Ca.R.] is placed in the home.” CP at 86. The commissioner noted in her oral ruling she wanted “the ICPC ... process to get started, not because it’s required for a parent but because of the additional oversight and it’s clear that you have a very good relationship with your social worker and they may be happy to supervise and give us the oversight there that we need.” CP at 327.
¶8 T.T. moved to revise the commissioner’s order, arguing she could provide counseling for the girls in Nevada through state agencies and insisting she was capable of caring for all five children. The court denied her revisions request, adopting the commissioner’s findings of fact and finding the dependency was based on “the children’s needs, to ensure their safety!,] and that a move to their mother’s home would be done in an appropriate manner that meets *607 their needs.” CP at 385. The court found, “It will be helpful to this family to have a social worker in Nevada, assigned through the ICPC process, who will help to provide services and supports in reintroducing these children to their mother’s home.” CP at 385. T.T. appealed.
ANALYSIS
A. Dependency Finding
¶9 The issue is whether the revision judge erred by abusing her discretion when denying revision of the commissioner’s dependency finding. T.T. contends substantial evidence does not support the court’s finding she is not capable of parenting Ca.R., Cl.R., and G.R.
¶10 “We review the superior court’s ruling, not the commissioner’s.” State v. Ramer, 151 Wn.2d 106, 113, 86 P.3d 132 (2004). Commissioner rulings are “subject to revision by the superior court.” RCW 2.24.050. On revision, the superior court reviews the commissioner’s findings of fact and conclusions of law de novo based on the evidence and issues presented to the commissioner. In re Marriage of Moody, 137 Wn.2d 979, 992-93, 976 P.2d 1240 (1999). We review a superior court’s dependency placement decision for abuse of discretion. In re Dependency of A.C., 74 Wn. App. 271, 275, 873 P.2d 535 (1994). A court abuses its discretion when it “applies the wrong legal standard, or bases its ruling on an erroneous view of the law.” Gildon v. Simon Prop. Grp., Inc., 158 Wn.2d 483, 494, 145 P.3d 1196 (2006).
¶ 11 Parents’ “fundamental liberty interest in the care and welfare of their minor children” must be balanced with the State’s “interest in protecting the physical, mental, and emotional health of children.” In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). Unless a child’s right to nurture, physical and/or mental health, or safety is endangered, “the family unit should remain intact.” RCW 13.34.020. But when the rights of the child and *608 the legal rights of the parents conflict, the child’s rights prevail, as the child’s health and safety are the paramount concern. Id. Declaring a child “dependent” transfers legal custody to the State. Schermer, 161 Wn.2d at 942. After filing a dependency petition, a fact-finding hearing is held to decide if the allegations are true. Id. The petitioner must show “by a preponderance of the evidence that the child meets one of the statutory definitions of dependency.” Id.
¶12 Relevant here, Washington defines a “dependent child” as a child who “[h]as no parent . . . capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child’s psychological or physical development.” RCW 13.34.030(6)(c). Dependencies based on RCW 13.34.030(6)(c) do not require a finding of parental unfitness; instead, they “allow! ] consideration of both a child’s special needs and any limitations or other circumstances which affect a parent’s ability to respond to those needs.” Schermer, 161 Wn.2d at 944. A child is not dependent if a capable parent exists. In re Welfare of Walker, 43 Wn.2d 710, 715, 263 P.2d 956 (1953).
 ¶13 When evaluating evidence to determine whether a child is dependent, trial courts have broad discretion and considerable flexibility to reach “ ‘a decision that recognizes both the welfare of the child and parental rights.’” Schermer, 161 Wn.2d at 952 (quoting In re Welfare of Becker, 87 Wn.2d 470, 478, 553 P.2d 1339 (1976)). A court has no required factors to consider. Becker, 87 Wn.2d at 477 (interpreting predecessor statute). Decisions to dismiss a dependency cannot “be based upon hunches or snap judgments”; all parties have a right to be heard, and children need a well-considered decision. In re Dependency of R.H., 129 Wn. App. 83, 88, 117 P.3d 1179 (2005).
¶14 Our “appellate review is limited to whether substantial evidence supports the trial court’s findings and whether the findings support its conclusions of law.” Schermer, 161 Wn.2d at 940. “Substantial evidence exists if, *609 when viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more likely than not to be true.” In re Welfare of X.T., 174 Wn. App. 733, 737, 300 P.3d 824 (2013). Furthermore, we do not reweigh evidence or reassess witness credibility. Id.
¶15 Here, the girls had not seen their mother since they were removed from her Nevada home three years earlier. They were removed based on allegations of sexual and physical abuse, substance abuse, and exposure to domestic violence. A dependency was started but dismissed without services to address the removal problems because the girls relocated to their father’s home in Oregon. The girls now show concerning behaviors such as head banging, unhealthy attachments, unfounded fears, anger, and nightmares. Nothing in this record indicates T.T. understands what the girls would need from her to address the girls’ difficult behaviors. Moreover, no plan is in place for preventing interaction between A.G.’s father and the girls in Nevada. Sending the girls to live with T.T. without an investigation and services in place would subject them to extraordinary risk of additional trauma due to a lack of emotional and behavioral support, as well as exposure to a former abuser. T.T. argues services are available through a program she is currently involved in, but further investigation is needed to make sure that the girls qualify for these services and the services are tailored to their, and T.T.’s, specific needs.
¶16 T.T. next incorrectly argues the court was required to find her unfit. The Department need not prove a parent is unfit to prove a dependency. Schermer, 161 Wn.2d at 944. A dependency based on RCW 13.34.030(6)(c) does not turn on parental “unfitness” but allows consideration of both a child’s special needs and any limitations or other circumstances that affect a parent’s ability to respond to those needs. Id.
¶17 This case, like the Schermer case, involves special needs and circumstances. The girls have not lived with their *610 mother since 2011, when they were removed from her home and dependency proceedings started. No services were offered because the girls relocated to Oregon to live with their father. The girls have been exposed to physical, sexual, and substance abuse, resulting in their present concerning behaviors. Here, it is sufficient for the Department to prove T.T. is not capable of adequately caring for Ca.R., Cl.R., and G.R. based on their special needs and the case circumstances. The Department has met this burden. Placing the girls with T.T. would put the children in circumstances that constitute a danger of substantial damage to their psychological or physical development, thus satisfying RCW 13.34.030(6)(c). Given all, we conclude the court did not abuse its discretion in finding the girls dependent.
B. Placement and ICPC Involvement
¶18 Based on her rejected adequate-parent arguments, T.T. contends the trial court erred in not placing the children with her. Thus, she incorrectly argues ICPC involvement is an unnecessary delay to placing the girls with her.
¶19 Dependency hearings determine what course of action serves the child’s best interests. Schermer, 161 Wn.2d at 942. In dependency proceedings, discretionary placement decisions are reviewed for an abuse of discretion. A.C., 74 Wn. App. at 276. “A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds.” In re Marriage of Kovacs, 121 Wn.2d 795, 801, 854 P.2d 629 (1993).
 ¶20 When placing a child, “the best interests of the child are the court’s paramount concern.” In re Dependency of R.W., 143 Wn. App. 219, 223, 177 P.3d 186 (2008). Because each case is fact specific, no exact criteria exists for determining what the child’s best interests are. Id. Even though a child’s interests are the paramount concern, the parents’ interests still have weight: courts are directed “to *611 adopt a program which will ‘least interfere with family autonomy, provided that the services are adequate to protect the child.’” In re Dependency of J.B.S., 123 Wn.2d 1, 12, 863 P.2d 1344 (1993) (quoting RCW 13.34.130(1)(a)). But, if it is not in the child’s best interests, a court is not required to reunite children with the parent who had custody at the time of the dependency action. R.W., 143 Wn. App. at 223.
¶21 The girls were not living with T.T. when the Washington dependency proceedings were initiated and had been previously removed from T.T.’s Nevada home for dependency proceedings. Nothing shows the girls’ special needs were remedied when they were sent to Oregon to live with their father. These facts provide tenable grounds for the court to deny in-home placement.
¶22 T.T. incorrectly argues the court erred by mandating ICPC proceedings before making a placement determination. The superior court judge adopted the commissioner’s findings of fact. Finding of fact i states, “An ICPC approval is needed so that the State of Nevada will provide oversight of the family if [Ca.R.] is placed in the home.” CP at 86. The word “needed” is not used to connote a prerequisite.
¶23 “The ICPC was drafted in the 1950s by a group of state social service administrators to address the problem of providing services to children placed across state lines.” In re Dependency of D.F.-M., 157 Wn. App. 179, 187, 236 P.3d 961 (2010). Its purpose is to encourage cooperation and information sharing among member states. Id. It is a tool for foster care placement or preliminary to an adoption. Id. at 188. Division One of this court held, “[T]he ICPC governs only the placement of children in substitute arrangements for parental care.” Id. at 191. The ICPC process does not govern placement of children with parents. Placement decisions are made by the courts. Our record does not disclose what, if any, response Nevada has made to Washington’s ICPC request. Thus, T.T.’s ICPC concerns are premature. Our case is unlike D.F.-M., where the court dealt with an Oklahoma ICPC process that interfered with *612 Washington’s placement decision. Here, the goal remains to investigate placement of the girls with T.T. with Nevada’s ICPC assistance.
¶24 In sum, the commissioner correctly noted the ICPC process was “not. . . required for a parent.” CP at 327. But this does not eliminate cooperation between the two states as the parties work toward reunification. Rather, consistent with D.F.-M., it leaves the decision of whether T.T. is capable of parenting the girls within the sound discretion of the trial court rather than an administrative agency. See D.F.-M., 157 Wn. App. at 192.
¶25 Affirmed.
Siddoway, C.J., concurs.