IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Detention of | No. 88024-1-I |
| K.L., | |
| | UNPUBLISHED OPINION |
| Appellant. | |

BOWMAN, A.C.J. — K.L. appeals the trial court's order committing him for 14 days of involuntary treatment.  He argues substantial evidence does not support the court's conclusion that he is gravely disabled under RCW 71.05.020(25)(b).  We affirm.

FACTS

In 2024, while K.L. was incarcerated at a Department of Corrections (DOC) facility, his behavioral health symptoms began to worsen.  In response, DOC referred K.L. for an evaluation with a designated crisis responder (DCR).  On April 8, Western State Hospital (WSH) admitted K.L.

On April 10, 2024, WSH petitioned under chapter 71.05 RCW to provide K.L. 14 days of involuntary treatment.  WSH alleged that K.L has schizophrenia and other psychotic disorder and is gravely disabled.  It alleged he has " 'repeated and escalating loss of cognitive and volitional control,' " evidenced by an increase in paranoid and delusional thought content, an increase in hallucinations, and a decreased ability to engage in reality-oriented conversation.  And it alleged that K.L. has impaired judgment and poor self-insight.  It noted that K.L. does not believe he has a mental illness and that his "discharge plan is not based in

reality." Finally, WSH alleged K.L.'s "limited insight is likely to prevent him from meeting his daily needs of health and safety independently."

On April 15, 2024, the court commissioner held a probable cause hearing on WSH's 14-day involuntary treatment petition. Dr. Pinar Kirsch, a WSH evaluator, testified on behalf of WSH.[1] Dr. Kirsch testified that he met with K.L. on April 9, 2024 for a mental status examination. He said he also met with K.L.'s medical team and reviewed WSH's records and the DCR's evaluation of K.L.

Dr. Kirsch testified that when he examined K.L., K.L. had "appropriate" hygiene and a cooperative attitude. But K.L. was "not oriented to his age" and his answers to questions were "mostly not relevant . . . , disorganized, nonsensical at times, and characterized by delusional content." For example, K.L. had ideas about "people with brown eyes . . . possibly not being real people, and people with blue eyes being real people because blue is reflected in nature." Dr. Kirsch testified that K.L. refused to take medication while at the hospital.

Dr. Kirsch stated that K.L.'s diagnoses are "unspecified schizophrenia spectrum and other psychotic disorders." And that as a result of those diagnoses, K.L. is gravely disabled. He explained that K.L. is not in cognitive control due to his disorganized thinking and delusional thoughts. And that K.L. cannot form a realistic plan for how he would take care of himself, so Dr. Kirsch did not "know how he would get housing, food, clothing, or anything like that." In Dr. Kirsch's opinion, based on past evaluations, "it seems like over the last few years [K.L.'s] presentation has worsened." He opined that without inpatient treatment, K.L.

---

[1] The parties stipulated that Dr. Kirsch is a mental health expert.

2

would not seek treatment, take his medication, or have housing, and that he "may engage in substance use[,] which would worsen his symptoms."

K.L. then testified on his own behalf. He asked the court to release him, saying that he does not have "any disorganized thoughts at all." And he testified, "I'm able to think for myself perfectly fine and I'm a safe person." But when his attorney asked if he understood the purpose of the medication that WSH tried to administer to him, K.L said, "I do not know what the pills they are trying to give me do[ ]. Nobody has ever explained that to me." And when his attorney asked about his release plan, K.L. responded, "I'm going to ask [WSH] to drop me off at the bank. From there, I'm going to be talking to them about housing and a monthly amount for myself." In response to whether K.L. would apply for disability benefits, K.L. said, "I'm going to ask a girl banker that."

The same day as the hearing, the commissioner entered findings of fact and conclusions of law and ordered 14 days of involuntary commitment. The commissioner found K.L. has "[u]nspecified schizophrenia spectrum," "other psychotic disorder," and substance use disorder. The commissioner further found that K.L. has disorganized and delusional thought processes and is vulnerable because of his "loss of cognitive control." Finally, the commissioner found that K.L. does not believe he has a mental health disorder or needs medication, so if WSH discharged K.L., he would not seek treatment or take medication and it is unlikely he would be able to obtain food or housing.

The commissioner concluded that because of K.L.'s diagnoses, he is "gravely disabled," as he

> manifests severe deterioration in routine functioning evidenced by

3

repeated[ ] and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.[2]

And the commissioner determined that there were no less-restrictive alternatives to involuntary detention and treatment.

On April 25, 2024, K.L. moved to revise the commissioner's order, arguing WSH failed to prove he is gravely disabled. The trial court denied K.L.'s motion to revise and adopted the commissioner's findings of facts and conclusions of law.

K.L. appeals.

ANALYSIS

K.L. argues the trial court erred by ordering that he be involuntarily committed. He contends substantial evidence does not support the court's conclusion that he is gravely disabled under RCW 71.05.020(25)(b). We disagree.

When the trial court has denied revision of the commissioner's decision, " '[w]e review the superior court's ruling, not the commissioner's.' " *In re Welfare of Ca.R.*, 191 Wn. App. 601, 607, 365 P.3d 186 (2015) (quoting *State v. Ramer*, 151 Wn.2d 106, 113, 86 P.3d 132 (2004)). For an involuntary commitment order, we review whether substantial evidence supports the trial court's findings of fact and whether those findings support the court's conclusions of law. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Substantial evidence is evidence sufficient " 'to persuade a fair-minded person of the truth of the declared

---

[2] *See* RCW 71.05.020(25)(b). We note that the statute in effect at the time of K.L.'s detention was former RCW 71.05.020(24)(b) (2018). Because the definition of "gravely disabled" has not changed, we cite the current statute.

premise.' " *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998)

(quoting *Holland v. Boeing Co.*, 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978)),

*aff'd*, 138 Wn.2d 898, 982 P.2d 1156 (1999).  Unchallenged findings of fact are

verities on appeal.  *In re Det. of L.S.*, 23 Wn. App. 2d 672, 686, 517 P.3d 490

(2022).

Involuntary commitment for behavioral health disorders "is a significant

deprivation of liberty which the State cannot accomplish without due process of

law."  *LaBelle*, 107 Wn.2d at 201.  To involuntarily commit a person for 14 days,

the court must find by a preponderance of the evidence that

> [the] person detained for behavioral health treatment, as the result of
> a behavioral health disorder, presents a likelihood of serious harm,
> or is gravely disabled, and, after considering less restrictive
> alternatives to involuntary detention and treatment, finds that no
> such alternatives are in the best interests of such person or others.

RCW 71.05.240(4)(a).

Under chapter 71.05 RCW, "gravely disabled" means

> a condition in which a person, as a result of a behavioral health
> disorder:  (a) Is in danger of serious physical harm resulting from a
> failure to provide for his or her essential human needs of health or
> safety; or (b) manifests severe deterioration in routine functioning
> evidenced by repeated and escalating loss of cognitive or volitional
> control over his or her actions and is not receiving such care as is
> essential for his or her health or safety.

RCW 71.05.020(25).

Evidence that a person is gravely disabled under subsection (b) of the

statute "must include recent proof of significant loss of cognitive or volitional

control."  *LaBelle*, 107 Wn.2d at 208; *see* RCW 71.05.020(25).  The evidence

must also show that involuntary treatment is "*essential* to an individual's health or

safety," and it should show "the harmful consequences likely to follow" if the court

5

does not order the treatment. *Id.* In sum, the individual must be "*unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.*

Here, the trial court found that K.L. has unspecified schizophrenia spectrum, other psychotic disorder, and substance use disorder. It found that his speech is "nonsensical" and "characterized by delusional content." And that his "cognitive control is impaired due to his delusions and disorganization," which makes him "very vulnerable." Further, the court found that K.L.'s symptoms have worsened over the last few years, yet K.L. does not believe he has a mental health disorder and refuses medication. Finally, the court found that because K.L. "cannot communicate in a reality-based manner," he has no discharge plan and would be "unlikely to obtain food or housing." These findings support the court's conclusion that K.L. has an "escalating loss of cognitive . . . control" and needs involuntary treatment for his health or safety, making him gravely disabled under RCW 71.05.020(25)(b).

K.L. challenges some of the trial court's findings as unsupported by substantial evidence. He argues no evidence shows "a diminution of [his] routine functioning." But a person's loss of cognitive control is evidence of their "severe deterioration in routine functioning" under RCW 71.05.020(25)(b). *See LaBelle*, 107 Wn.2d at 208. And the record shows that K.L. had significant loss of cognitive control. Dr. Kirsch testified that K.L.'s answers to questions were "disorganized, nonsensical at times, and characterized by delusional content." He said K.L. thought people with brown eyes might not be "real people," while people with blue eyes are "real people" because "blue is reflected in nature." He also

testified that K.L. once approached a nurse about needing surgery for "a chip in his skull." And K.L. himself testified that his plan after his release was to have WSH "drop me off at the bank" to "talk[ ] to them about housing and a monthly amount for myself." Further, K.L. believes he does not have a behavioral health disorder or need medication.

Finally, K.L. argues substantial evidence does not support finding that he would be unable to care for himself if WSH discharged him. But, considering the evidence showing K.L.'s loss of cognitive control, Dr. Kirsch opined that without involuntary treatment, K.L. would not have housing or treatment and "would continue to not take medication." Still, K.L. contends Dr. Kirsch's assessment that he would not take his medication was "speculative" and inaccurate. But the record shows that K.L. refused medication at WSH. And we do not reweigh evidence or reassess witness credibility. *Ca.R.*, 191 Wn. App. at 609.

Because substantial evidence supports the court's conclusion that K.L. is gravely disabled, we affirm.

_____, ACJ

WE CONCUR:

_____
Díaz, J.

_____

7